## GRAYSON *v.* HUGHES.

### Opinion delivered November 10, 1924.

1. TRUSTS—EVIDENCE.—Evidence *held* to establish that a quitclaim deed given by intestate's widow and certain of his heirs to a coheir was for the purpose only of paying off a mortgage, and therefore the grantee held in trust for that purpose.

2. TRUSTS—BREACH OF TRUST.—Where lands were granted in trust to enable the grantee to incumber them to pay off an existing mortgage, a purchase of the lands by him at foreclosure sale was a violation of the trust, and did not convey any better title than he already had.

3. TRUSTS—AUTHORITY OF TRUSTEE TO CONVEY.—Where heirs quitclaim their land to enable a coheir to pay off their ancestor's mortgage, and he, in violation of the trust, purchased the lands at foreclosure sale and then sold oil rights for more than enough to discharge the mortgage, he thereby carried out the terms of the trust, and had no right which he could convey except to innocent purchasers.

4. VENDOR AND PURCHASER—NOTICE OF EQUITIES.—Evidence *held* to show that a purchaser of land from one who in fact held as trustee had either actual knowledge of such trust or notice of such facts and circumstances as by inquiry would lead to knowledge thereof.

5. TRUSTS—ALLOWANCE TO TRUSTEE FOR IMPROVEMENTS.—A trustee is not entitled to reimbursement for unauthorized improvements on the trust property, especially where he does not show what value they added to the property.

Appeal from Ouachita Chancery Court, First Division; *J. Y. Stevens,* Chancellor; affirmed.

### STATEMENT OF FACTS.

Appellees brought this suit in equity against appellants to cancel certain deeds and oil and gas leases whereby the title to the lands described in the complaint was divested out of appellees and invested in appellants.

Appellants claimed title to the lands in themselves, and appellant, P. C. Grayson, interposed the further defense that he was an innocent purchaser for value of the lands.

The lands in controversy comprised 200 acres, and originally belonged to Sam A. Hughes. On April 14,

1917, Sam A. Hughes and Maria Hughes, his wife, executed a deed of trust to said lands to Sam Pruett, trustee, to secure the payment of an indebtedness of $1,286.41 to Lester & Haltom. In August, 1918, Sam A. Hughes died intestate in Ouachita County, Arkansas. At the date of his death he resided with his wife on the lands in controversy and occupied them as his homestead. No part of the mortgage indebtedness above set forth had been paid at the date of his death.

On the 9th day of January, 1919, Maria Hughes, the widow of Sam A. Hughes, and Charlie Hughes and Ada Bell, his son and daughter, executed a quitclaim deed to said lands to Jim Hughes, another son of the said Sam A. Hughes. The consideration recited in the deed is the balance due on the mortgage on the lands and the further consideration of $10. The lands in question were sold by Sam Pruett, as trustee, in accordance with the provisions of the power of sale contained in the deed of trust, and Jim Hughes became the purchaser at the sale for $1,500. On the 17th day of May, 1919, Sam Pruett, as trustee, executed a deed to said lands to Jim Hughes.

In addition to the facts recited above, this deed also recites that Lester & Haltom had transferred the deed of trust under which the lands were sold, together with the notes secured by them, to P. C. Grayson. On the 11th day of June, 1919, Jim Hughes and his wife executed a deed of trust to said lands to Sam Pruett, as trustee, to secure P. C. Grayson in the sum of $1,500. On the 16th day of May, 1919, Jim Hughes gave an oil and gas lease on said lands to J. H. Hughes for the term of five years. On January 20, 1920, Jim Hughes executed a deed of trust to said lands in favor of P. C. Grayson to secure him in the sum of $2,800. On the 12th day of June, 1920, Jim Hughes and wife executed a deed to P. C. Grayson to a one-half interest in all the oil, gas and minerals on said lands. On the 26th day of October, 1920, Jim Hughes and wife executed a deed to P. C. Grayson to 120 acres of said land, and the consideration recited in the deed is $1,200. On April 26, 1920, Jim Hughes and wife

sold one-eighth of the oil, gas and minerals in said lands for the sum of $2,000. Out of this money he paid P. C. Grayson $1,500 and kept the balance. Jim Hughes owed P. C. Grayson $2,800, including the $1,500 borrowed from him to satisfy the mortgage given by Sam A. Hughes to Lester & Haltom.

According to the testimony of Maria Hughes, she signed the quitclaim deed to her son, Jim Hughes, to the lands in question in order to pay off the mortgage which she and her husband had executed on the lands in favor of Lester & Haltom. She does not know why Jim Hughes bid in the lands in his own name at the sale of Pruett, trustee, on May 17, 1919. She knows nothing about the mortgage given by her son, Jim Hughes, to P. C. Grayson. in June, 1919. She gave her son no authority to execute this mortgage, and did not know anything about her son executing the second mortgage to Grayson to secure a note of $2,800. She did not give him any authority to execute this mortgage. She did not know anything about her son conveying one-half of the oil, gas and minerals on said lands to P. C. Grayson in June, 1920. She did not know anything about the conveyance by Jim Hughes to P. C. Grayson of 120 acres of the said lands in October, 1920. She and her son, Jim Hughes, have both been living on the lands since before her husband's death, but they have lived in separate houses.

According to the testimony of Charlie Hughes, his brother, Jim, asked him to sign the quitclaim deed in order to enable him to raise the money with which to pay off the mortgage which had been executed by their father. It was the understanding that he was to get his share in the lands after the mortgage had been paid off. He did not give Jim Hughes any authority to sell the lands or any part of them, except to pay off the mortgage indebtedness of their father.

According to the testimony of Ada Bell, she executed a quitclaim deed to the lands to her brother, Jim Hughes, for the purpose of raising money with which to pay off the mortgage indebtedness of their

father. Jim Hughes gave her a contract that, as soon as the mortgage was raised on the place, he would deed her share back to her.

Ewell Johnson, the husband of another daughter of Sam A. Hughes, testified that Jim Hughes said that he had sold some mineral rights on the lands for $2,000 and had redeemed the place from Mr. Grayson.

According to the testimony of Jim Hughes, he took charge of the affairs of his father after his death, at the request of his mother and brothers and sisters, in order to settle the mortgage indebtedness of his father and a few other debts. Lester & Haltom transferred the mortgage in their favor to P. C. Grayson because they wanted their money. The witness borrowed the money from P. C. Grayson to pay this mortgage, and he paid to Lester & Haltom the sum of $1,286.41 in full of their mortgage indebtedness. He made this payment early in 1919, before the lands were sold under the power of sale contained in the mortgage. The witness paid $1,500 for the property at the mortgage foreclosure sale, in order to get title to the lands. He insisted on Grayson having the lands sold under the power of sale contained in the mortgage, and borrowed the $1,500 from Grayson with which to pay for the lands at the sale. P. C. Grayson claimed to be an innocent purchaser for value of the lands from Jim Hughes, and the evidence on both sides on this point will be abstracted under an appropriate heading in the opinion.

The chancellor was of the opinion that the title of the purchaser of the one-eighth interest in the oil and gas in said lands under the deed executed to them by Jim Hughes should be in all things confirmed.

The chancellor was also of the opinion that the deed of trust executed by Jim Hughes to P. C. Grayson to secure the payment of $1,500 owed on the mortgage indebtedness of Sam A. Hughes had been paid off, and that P. C. Grayson had knowledge of the equities of the plaintiffs at the time he purchased one-half of the oil, gas, and minerals in the lands, and at the time he pur-

chased 120 acres of the lands. It was decreed that said deeds be declared null and void.

It was also decreed that the quitclaim deed given to Jim Hughes by Maria Hughes, the widow of Sam A. Hughes, deceased, and Charlie Hughes and Ada Bell, his son and daughter, should be canceled.

P. C. Grayson and Jim Hughes have duly prosecuted an appeal to this court.

*Gaughan & Sifford,* for appellant.

1. Where suit is filed alleging that the holder of a legal title to land had notice of some secret equity, the burden is on the plaintiff to sustain that allegation. 35 Ark. 100. If the defendant, claiming to be an innocent purchaser, proves that he paid a valuable consideration for the property, the burden then shifts to the plaintiff to show that he had notice of the secret equity. 129 Ark. 305; 108 Ark. 490; 145 Ark. 121; 134 Ark. 241. There is no showing of fraud or collusion on the part of Grayson with Jim Hughes to defraud the heirs, nor is there any finding by the court to that effect. Grayson's position is sustained, we think, by act 444, approved March 27, 1919, Acts 1919, p. 327, § 1. Surely plaintiffs have no greater rights in this instance, where the deed was made straight to Jim Hughes, grantee, than they would have had if it had been made to Jim Hughes, *trustee,* or *as trustee.*

2. The interest of Charlie Hughes and Ada Bell, at least, should be charged with their part of the value of improvements made by Jim Hughes. A tenant in common making necessary repairs is entitled to contribution. 31 Ark. 559; 68 Ark. 534; 121 Ark. 107.

*Thos. W. Hardy,* for appellees.

1. Jim Hughes, at the trustee's sale, acquired no right, title or interest in the lands adverse to the appellees, his cotenants, other than to demand contribution. 55 Ark. 104; 145 Ark. 189. The latter or either of them had the right to redeem within twelve months after the trustee's sale. C. & M. Digest, § 7407. The receipt, within twelve months, by Jim Hughes, of $2,000

from a one-eighth of the mineral rights from the land, was clearly a redemption of the land, and extinguished any right or claim he might have had against his mother, brother, sister and nieces for contribution. The defeasible title of Jim Hughes was abrogated, and the deed of trust became void. 40 Ark. 275; 65 Ark. 133; 43 Ark. 504. Jim Hughes could not in any way take advantage of appellees in the purchase at the trustee's sale, or in receiving the money from the sale of mineral rights; what he did was for the benefit of the cotenants as much as for himself. 49 Ark. 242; 68 Ark. 542; 144 Ark. 49.

2. Appellees charge in their complaint that Grayson had knowledge of the title of Jim Hughes and the rights and equities of the appellees in the land. The possession of Maria Hughes was equivalent to notice. 76 Ark. 25; 152 Ark. 232; 162 Ark. 140. Grayson's long residence in the immediate neighborhood of the Hughes family was sufficient, in addition to the fact of possession, to put him on inquiry as to the rights and equities of the appellees. 58 Ark. 84; 137 Ark. 18. He was bound, as mortgagee, and grantee in the deeds, to take notice of the infirmities appearing in the chain of title. 150 Ark. 355; 146 Ark. 246; 144 Ark. 79.

HART, J., (after stating the facts). The chancellor found that the quitclaim deed from Maria Hughes, Charlie Hughes, and Ada Bell to Jim Hughes, executed on the 9th day of January, 1919, was for the purpose of enabling him to pay off a mortgage which his father had given on the lands to secure an indebtedness which he owed to Lester & Haltom, in the sum of $1,286.41. After Sam A. Hughes died, in August, 1918, Lester & Haltom began to press his heirs for the payment of their mortgage indebtedness. In order to discharge this indebtedness, Jim Hughes was requested by his mother, brothers and sisters to take charge of his father's affairs. He did so, and induced P. C. Grayson to take up the mortgage of Lester & Haltom. On the 9th day of January, 1919, the quitclaim deed from his mother and brother and sister was executed to him, and it recites that it is in considera-

tion of the balance due on the mortgage. All three of the grantors named in the deed testified that it was given by them to enable Jim Hughes to raise money with which to pay off the mortgage indebtedness. The husband of another sister testified that Jim Hughes told him that he had sold some mineral rights on the lands for $2,000, and had paid off the mortgage. Jim Hughes himself testified that he procured Grayson to sell the lands under the power of sale contained in the deed of trust, and became the purchaser at the sale in order to get the title in himself. This sale was after the quitclaim deed had been executed to him. Thus it will be seen that his own testimony shows that there was no intention to give him an absolute title to the lands when the quitclaim deed was executed to him by his mother, brother and sister.

Mrs. Bell testified that he gave her a contract to convey the lands back to her after the mortgage indebtedness had been paid. The mother and brother testified that Jim Hughes promised them that they should have back their interest in the lands after the mortgage indebtedness was satisfied.

It is true that Jim Hughes purchased the lands at the mortgage foreclosure sale, and received a deed to the lands from the trustee making the sale; but this was in violation of the terms of the trust, and conferred no greater title than he already possessed by virtue of the quitclaim deed. Under the evidence just recited, the chancellor was right in holding that Jim Hughes' mother, brother and sister still retained their beneficial interest in the lands, and that he merely became a trustee for them under their agreement at the time the quitclaim deed was executed.

Jim Hughes became the purchaser at the mortgage foreclosure sale on May 17, 1919, for $1,500. He gave P. C. Grayson a mortgage on the lands to secure this sum. Before the period of redemption had expired he had sold some oil and gas rights in the lands for $2,000 and paid back the $1,500 which he had borrowed from Grayson. Thus it will be seen that, having carried out the terms of

the trust by paying the mortgage indebtedness, Jim Hughes held the legal title to the interest of Maria Hughes, Charlie Hughes and Ada Bell in trust for them. Therefore he had no right to convey their interest in the lands to P. C. Grayson, and the latter should not acquire any greater rights under the deeds given to him by Jim Hughes, unless he is an innocent purchaser for value without notice of their equities.

This brings us to a consideration of that question. It is strongly urged by counsel for Grayson that he is an innocent purchaser for value in all of said lands, both as to the oil and gas rights in all the lands, and 120 acres of the lands in question purchased by him from Jim Hughes.

Both Mrs. Maria Hughes and Jim Hughes lived on the lands in question at the time of the execution of the quitclaim deed, and Maria Hughes has continued to live there since that time.

To sustain the decree, counsel for appellees invoke the rule that one who purchases land in another's possession takes with notice of the latter's rights and equities, as held in *Sproull* v. *Miles,* 82 Ark. 455; *Crawley* v. *Neal,* 152 Ark. 323, and other decisions of this court.

It will be noted that Mrs. Hughes, one of the grantors in the quitclaim deed, and Jim Hughes, the grantee therein, both lived on the lands at the time of the execution of the said deed. We do not deem it necessary to decide whether, under these circumstances, her continued possession of the lands would be notice of her equities to Grayson, who purchased from her son, Jim Hughes. We deem it sufficient to say on this point that her continued possession, under the circumstances, was a fact to be considered in determining whether or not Grayson was an innocent purchaser for value of the lands.

Grayson admitted that he lived within two or three miles of the lands. He knew Sam A. Hughes in his lifetime, and he knew that Hughes had executed a mortgage on the lands to secure an indebtedness of $1,286.41 which he owed Lester & Haltom. He admits that he paid off

the Lester & Haltom mortgage on February 1, 1919, and it appears from other testimony that the mortgage was transferred to him. Grayson also admitted that Jim Hughes asked him to pay off the Sam Hughes mortgage until he could see the heirs and get them to take the matter up. He testified further that he took up the Lester & Haltom mortgage, and that they (referring to the heirs of Sam Hughes, deceased) failed to raise the money with which to satisfy the mortgage.

The fact that Jim Hughes asked him to pay the mortgage off until he could see the heirs tends to show that he recognized their interest in the lands as still existing. A short time after this Jim Hughes asked Grayson to foreclose the mortgage, so that he could buy the lands in at the sale and thereby get title to them. Grayson lived only two or three miles from the lands, and it is inferable that he knew that Mrs. Hughes continued to reside on the lands after the execution of the quitclaim deed. She and Jim Hughes lived in separate houses, and this tended to show that she was living there in her own right.

To overcome Grayson's plea of innocent purchaser, it was only necessary for appellees to show by a preponderance of the evidence that he had actual knowledge of their equities, or that he had notice of such facts and circumstances as would lead to knowledge by inquiries made by a man of ordinary intelligence. *Krow & Neumann* v. *Bernard,* 152 Ark. 99.

It is next insisted that, in any event, the interest of Charlie Hughes and Ada Bell should be charged with their part of the value of the improvements made on the place by Jim Hughes, which amounted to $1,800.

In the first place, it may be said that Jim Hughes makes no claim, in his answer, for the value of the improvements; and the testimony on this point was brought out in an incidental way. Jim Hughes was asked if he had not told Charlie Hughes and Ada Bell that they were to have back their interests in the lands, and answered, "Whenever I have made enough to pay

off the debts of the estate." He was then asked if he did not get enough to pay the money back he had borrowed, and was further asked what expenses he was out. He answered that he built four houses and cleared forty or fifty acres. Further along in his testimony he stated, in a general way, that the cost of these improvements amounted to $1,800. He did not enter into any particular statement as to his reasons for building the houses and the cost of each one. He does not state what value they would add to the lands. In this connection it may be stated that he admitted that he was to let his brother and sister have their interests in the lands back when he paid off the debts. According to his own admission, he did not have the right to make these improvements under his agreement with them. His only right to the possession of the lands was to mortgage or otherwise incumber them for the purpose of paying off the mortgage indebtedness of his father. In this connection it may also be stated that he received $500 in excess of the amount borrowed to pay off the mortgage debt.

Therefore we hold that no issue was made as to his recovery of the value of his improvements, and no error can be predicated upon the failure or refusal of the chancellor to allow them.

It follows that the decree must be affirmed.