Orvind Clay BOWEN and Eva Jane BOWEN, Husband and Wife *v.* Bob Sherel PERRYMAN and Betty Joyce PERRYMAN, Husband and Wife

73-258                                    506 S.W. 2d 543

Opinion delivered March 11, 1974

*Niblock, Hipp & Odom,* for appellants.

*Evans, Carson & Ludwig,* for appellees.

J. Fred Jones, Justice. This is an appeal by Orvind Clay Bowen and his wife from an adverse chancery court decree in a suit filed by Bob Sherel Perryman and his wife against the Bowens to quiet and confirm title to 9.31 acres of Benton County land. For convenience the parties will hereafter be referred to in the singular as Bowen and Perryman.

Both Bowen and Perryman claim title to the same portion of the 9.31 acre tract through overlapping descriptions in their muniments of title and they both deraign the title they claim to the disputed area through a common grantor, Audie Eagle. According to a surveyor's plat offered in evidence, and for the purpose of this opinion, the entire tract actually consists of 9.91 acres lying east and west in the form of a 375 foot wide parallelogram, with its east end bounded by Springdale Ellis Ford Road. A private gravel road runs roughly in a northwest-southeast direction across the tract, thus dividing it into northeast and southwest portions with the northeast portion, as designated on the plat, containing 4.73 acres more or less, and the southwest portion containing 4.63 acres more or less. In the southwest portion of the tract there appears a plot designated three-fourths acre in the form of a parallelogram measuring 100 feet north and south by 300 feet east and west, with its south line coinciding with the south line of the entire tract. Bowen admittedly owns this three-fourths acre plot by deed not in question. The property that is in question is a part of the 4.63 acres in the southwest portion of the tract lying north and west of Bowen's three-fourths acre plot and between it and the graveled private roadway.

It appears that on October 25, 1966, Audie Eagle and his wife acquired the entire tract of land involved here from Mr. and Mrs. Robert Luper and Ras Autry by warranty deed. The property was described in the deed as follows:

"Beginning at the southeast corner of the north 30 acres of that part of the north half of the northeast quarter of section 21, in township 18 north, range 29 west, which lies west of the middle of the Springdale and Ellis Ford Public road as said road is now laid out and running thence west 1329.9 feet, thence south 375 feet, thence east 1121.3 feet, thence north 208.6 feet, thence east 208.6 feet, or to the middle of said public road, as now laid out, thence north 16 degrees and 42 minutes east with the middle of said road 182.9 feet to place of beginning."

This deed description includes the three-fourths acre plot subsequently sold to Bowen and was filed for record on November 8, 1967. Bowen's deed to the three-fourths acre was from Luper and was dated December 13, 1966, and filed for record February 6, 1967. Bowen lives on the three-fourths acre.

Under date of October 25, 1967, Mr. and Mrs. Eagle executed a mortgage on the above described property to Robert L. Spencer and his wife to secure the payment of $6,000 payable at $70 per month. On the same date, and apparently simultaneously with the execution of the mortgage, Mr. and Mrs. Eagle executed a warranty deed conveying the property to the Spencers. The mortgage was filed for record on November 8, 1967, but the deed was not filed for record until November 16, 1971. The evidence is not clear as to the details of this transaction but it appears that Mr. Eagle was employed by Spencer when Eagle borrowed $6,000 from Spencer and executed the mortgage and deed. The evidence is clear that both instruments were left in the First State Bank of Springdale where the payments were to be made. The evidence is rather clear that when Mr. Eagle concluded he would be unable to continue payments on the mortgage indebtedness, Mr. Spencer refunded a part or all of the amount Eagle had paid; recorded his deed on November 16, 1971, and four days later, on November 20, 1971, executed a warranty deed transferring the property to the appellees, Perryman and his wife Betty. This deed was filed for record on December 2, 1971, and apparently in connection with this transaction on November 19, 1971, the Perrymans executed a mortgage on the property to the Spencers to secure the pay-

ment of $8,000 payable in monthly installments of $80 each. The mortgage was filed for record on November 30, 1971. The land description as above set out, was the same in all of these transactions and encompassed the 100x300 foot plot already referred to as belonging to the appellant Bowen.

On September 22, 1969, Mr. and Mrs. Eagle entered into a written contract with Mr. and Mrs. Bowen designated "Contract For The Sale Of Land." This contract is copied in full and appears as follows:

"This contract made and entered onto [sic] on this the 22nd. day of September, 1969, by and between Audie Eagle and Nettie Eagle, his wife, hereinafter known as the sellers, and Clay Bowen and Eva Bowen, his wife hereinafter known as the buyers.

The sellers hereby sell to the buyers, and the buyers agree to purchase from the sellers, the following describ-ed lands situated in Benton County, Arkansas, to-wit:

Beginning at the southeast corner of the north 30 acres of that part of the north half of the northeast quarter of section 21 in township 18 north, range 29 west, which lies south of the middle of the private road running east and west said road is now layed out running west to line then south to line joining land owned by Pete Sigman then east to land owned by buyers then north to point of beginning. Land described is four and 1/4 acres more or less. Buyers agree to pay sellers the sum of $1700 with $1200 down and $25 a month, with no interest until the [sum] of $500 is paid.

Beginning 22nd. October, 1969.

Said seller agrees to furnish clear title to said land when balance is paid."

When the contract between Eagle and Bowen was entered into on September 22, 1969, the mortgage from Eagle to Spencer was on record as of November 8, 1967, but the deed from Eagle to Spencer was not filed for record until November 16, 1971, three days before Spencer sold to

Perryman. In other words, when Eagle entered into the contract with Bowen, the record title was still in Eagle subject to Spencer's mortgage, and it was over one year before Spencer recorded his deed and sold the property to Perryman.

According to Mr. and Mrs. Bowen, they went into immediate possession of the property under their contract with Eagle. They said they built a barn, sowed pasture grass and dug a stock pond on the property; that they had no notice whatever that anyone else claimed title to the property until sometime after they built a new barbed wire fence, in place of an old one, along the south side of the private road. They said that after Perryman had the property surveyed in June, 1972, he claimed title to the property under his deed from Spencer.

On June 29, 1972, Perryman filed his suit against Bowen alleging an unbroken chain of title to the property as described in his deed. He deraigned title from the United States Government through Eagle and Spencer and alleged that he and his predecessors in title had entered into possession of the lands and established definitely defined lines and corners which had remained for more than 30 years, and he alleged pedal possession in himself and his predecessors in title for more than 25 years. Perryman acknowledged in his complaint the conveyance of the 100x300 foot plot from Luper to Bowen and alleged that, notwithstanding the description in his deed, Bowen had encroached upon Perryman's land; had recently erected a fence thereon and "fences out 4.63 acres plus or minus of the plaintiffs' land." The complaint then prayed a mandatory injunction requiring Bowen to remove the fence line and replace the land in its prior condition; for $5,000 in damages for trespass committed by Bowen, and that title be quieted and confirmed in Perryman.

The chancellor found from the evidence submitted that Perryman was entitled to the relief he prayed, and title to the property as described in Perryman's deed, with the exception of the 100 x 300 foot plot described in Bowen's deed, was confirmed in Perryman. Bowen was ordered to remove his fence and posts from the property and was enjoined from interfering with Perryman in the erection of fences along the boundary lines of his property as confirmed in the decree.

On appeal to this court Bowen contends, for the first

time, that the chancery court did not have jurisdiction of the subject matter ·in dispute because Perryman was not in possession of the land when his suit was filed and was, therefore, not entitled to have his title quieted in equity. We agree with Perryman that this contention is controlled by our decision in *Green* v. *Garrett*, 225 Ark. 311, 280 S.W. 2d 905, where we held, in a similar case, that the objection went to the adequacy of the remedy at law; that it was waived when not timely interposed, and was clearly too late when raised for the first time on appeal. See also *Love* v. *Bryson,* 57 Ark. 589, 22 S.W. 341. Bowen next contends that the chancellor's finding that title should be quieted in Perryman is contrary to the law.

We agree with Bowen, that under the evidence in the record before us, he was a bona fide purchaser without notice when he entered into his purchase contract with Eagle on September 22, 1969, (signed before notary October 13, 1969) because on that date the deed from Eagle to Spencer had not been filed for record and only the mortgage from Eagle to Spencer had been filed for record. The deed from Spencer to Perryman was not even executed until November 20, 1971. There is nothing else in the record that would have put Bowen on notice that Eagle did not have good title subject to the mortgage with right of redemption.

Of course, Bowen's sale contract was not filed for record when Perryman received his deed from Spencer and when his and Spencer's deeds were recorded. Both parties recognize and rely on Ark. Stat. Ann. § 16-115 (Repl. 1968) which provides as follows:

"No deed, bond, or instrument of writing, for the conveyance of any real estate, or by which the title thereto may be affected in law or equity, hereafter made or executed; shall be good or valid against a subsequent purchaser of such real estate for a valuable consideration, without actual notice thereof; or against any creditor of the person executing such deed, bond, or instrument, obtaining a judgment, or decree (which by law may be alien upon such real estate), unless such deed, bond, or instrument, duly executed and acknowledged, or proved, as is or may be required by law, shall be filed for record in the office of the clerk and

ex officio recorder of the county where such real estate may be situated."

All of the transactions were for value so we are of the opinion that the question should turn on whether Perryman was a bona fide purchaser without notice when he purchased the property from Spencer. As already pointed out, there was nothing of record that would place Perryman on notice of the prior sale of the property to Bowen, so the question comes down to whether Perryman had *actual* notice of matters which should have put him on inquiry as to the interest claimed by Bowen when Perryman purchased the property from Spencer.

The law is well-settled in Arkansas that a second purchaser will be deemed to have actual notice if the first purchaser shows by a preponderance of the evidence, that the second purchaser had notice of such facts and circumstances as would put a man of ordinary intelligence and prudence on such inquiry if diligently pursued, would lead to knowledge of his rights. Sufficient notice to incite attention, put a party on guard, and call for inquiry, is notice of everything to which the inquiry might lead and whenever one has sufficient information to lead him to a fact, he shall be deemed conversant with it. We have also held that proof of sufficient notice to place the junior conveyee on inquiry may be established by circumstantial evidence. *Wyatt* v. *Miller,* 255 Ark. 304, 500 S. W. 2d 590, and cases there cited.

In *Woods* v. *Wright,* 254 Ark. 297, 493 S.W. 2d 129, we said:

"It was only necessary that appellee show by a preponderance of the evidence that appellant had notice of such facts and circumstances as would put a man of ordinary intelligence and prudence on inquiry which, if diligently pursued, would lead to knowledge of his rights." *Grayson* v. *Hughes,* 166 Ark. 173, 265 S.W. 836; *Valley Planing Mill Co.* v. *Lena Lumber Co.,* 168 Ark. 1133, 272 S.W. 860. Such proof may be made by circumstantial evidence. *Krow & Neumann* v. *Bernard,* 152 Ark. 99, 238 S.W. 19. Whatever is notice enough to excite attention, put a party on guard and call for inquiry is notice

of everything to which the inquiry might lead, and whenever one has sufficient information to lead him to a fact he shall be deemed conversant with it. *Henderson* v. *Ozan Lumber Co.*, 216 Ark. 39, 224 S.W. 2d 30; *Millman Lumber Co.* v. *Bryant*, 213 Ark. 277, 209 S.W. 2d 878. See also *Holloway* v. *Eagle*, 135 Ark. 206, 205 S.W. 113; *Love* v. *Bryson*, 57 Ark. 589, 22 S.W. 341; *Reynolds* v. *Moseley*, 32 F. 2d 979 (8th Cir. 1929). We find no error in this respect."

In *Grayson* v. *Hughes*, 166 Ark. 173, 265 S.W. 836, we stated the rule in language as follows:

"To overcome Grayson's plea of innocent purchaser, it was only necessary for appellees to show by a preponderance of the evidence that he had actual knowledge of their equities, or that he had notice of such facts and circumstances as would lead to knowledge by inquiries made by a man of ordinary intelligence. *Krow & Neumann* v. *Bernard*, 152 Ark. 99."

In *Valley Planing Mill Co.* v. *Lena Lbr. Co.*, 168 Ark. 1133, 272 S.W. 860, we said:

"The rule is: 'Notice of facts putting a man of ordinary prudence on inquiry is tantamount to knowledge of the facts to which the inquiry might lead.' *Holloway* v. *Eagle*, 135 Ark. 206, and cases cited therein."

See also *Henderson* v. *Ozan Lbr. Co.*, 216 Ark. 39, 224 S.W. 2d 30; *Millman Lbr. Co.* v. *Bryant*, 213 Ark. 277, 209 S.W. 2d 878.

Mr. Harvey D. Luttrell testified that he made a survey of the property involved at the request of Mr. Perryman and made the plat which was offered in evidence. He said he was prevented from making a complete and accurate survey of the entire tract but was only able to complete an accurate survey of the 4.73 acres on which Mr. Perryman's house was located. He said he attempted to follow the description in Mr. Perryman's deed; that a gravel drive or roadway divided the property approximately in half, with 4.73 acres more or less on which Mr. Perryman's house was located on the northeast side of the roadway and 4.60 acres more or less on the

southwest side of the roadway. He said there was a fence along the southern edge of the gravel roadway; that there was a barn and what appeared to be cow sheds southwest of the fence. He said the gravel roadway was approximately 12 feet wide and extended completely through the property and the fence was along the south side of the gravel road.

Mr. Robert Spencer testified that he executed the deed to Perryman; that he had never been on the land and did not know that Mr. Bowen was claiming any interest in any of the land embraced in the description of the deed he gave to Perryman. He said he did not examine the deed records but only followed the same description in his deed from Eagle. Mr. Spencer was very vague and indefinite concerning the transaction between himself, Eagle and Perryman. The substance of his testimony was simply to the effect that Eagle worked for him and was about to lose the land he had purchased, so he loaned Eagle some money and Eagle gave him a mortgage and also a deed to the property; that the mortgage and deed were deposited in the bank where Eagle was to make the payments; that when Eagle was unable to continue the payments, he sold the land to Perryman and reimbursed Eagle the amount he had paid. He testified that the First State Bank of Springdale was collecting the payments from Eagle and that he was simply not familiar with the recording of the deeds. He said that when he sold the land to Perryman, he was not familiar with what he intended to convey, but that when Mr. Eagle abandoned the property, he simply refunded to Eagle $1,500 of the amount he had paid on the property and signed a deed to Perryman. He said he had been by the property but had never been over it and did not know anything about the fences or roadway across the property.

Mr. Perryman testified that he purchased the property from Mr. Spencer and paid for it with the money he borrowed from the First National Bank. He denied that he gave a mortgage back to Mr. Spencer. He said he discussed the deal with Mr. Eagle and Mr. Spencer in Spencer's office, and that Eagle told both of them that there was a little less than 10 acres in the tract. He said that he first became aware someone might have been claiming a part of his land when he saw some of Clay Bowen's livestock on it. He said he had the

land surveyed and found that about four acres of his land had been *fenced* out. He said his survey line ran about one inch from Bowen's house on the Bowen three-fourths acre but he is not claiming the three-fourths acre because Bowen lives on it.

On cross-examination Mr. Perryman testified that the fence Mr. Bowen built south of the road across the property belongs to him because it is on his land, and that Mr. Bowen had him put in jail for cutting the fence. He said the fence is a six strand barbed wire fence. He said that he lived on the north portion of the property and paid rent to Mr. Eagle for one month before he purchased the property. He then testified as follows:

"Q. And you lived there a month, did you run any livestock on the premises?

A. No. Chickens was all.

Q. And then you started thinking about buying the property?

A. Right.

Q. Did you walk over it?

A. Not all of it. Cause I didn't know where it was at.

Q. You still don't know either, do you?

A. Yes, I do.

Q. How much of it did you walk over?

A. Well I went all the way down that road, but I didn't go on this other property because there was livestock in there and I didn't know for sure what the deal was on it.

Q. All right, and you walked along this road, is that road along that fence where it was surveyed?

A. Yes.

Q. You walked on this side of the fence, on the North side of the fence?

A. Right.

Q. All the way through?

A. Right.

Q. Now does the fence stay with the road all the way through?

A. Yes.

Q. Or does it leave the road and go down in the draw, almost to the West end?

A. Almost to the West end it does, yes.

\* \* \*

Q. Now you walked over this property here and you didn't get over this fence because there was livestock in there and it had been cleaned off and permanent grass sowed?

THE COURT: Now that's South?

A. I didn't want to go on nobody else's property until I found out where the lines was.

Q. All right, so you was out there at that time?

A. No, I didn't go over at that time until after I decided to buy it.

Q. All right, and you dediced to buy this on the North side of the fence because you didn't know what the status of this South of the fence was?

A. I bought just exactly what was on the deed.

Q. Just exactly what was on the deed?

A. That's right.

Q. When did you make that decision?

A. It was in October when we decided to buy it.

Q. All right, that's when you decided to buy it, October the 2nd you started renting out there, didn't you?

A. Yes.

Q. So it was some time in November or later that you decided to buy it?

A. The last part of October we decided to buy it.

Q. And you had walked over this land inside or North of the fence then before you bought it?

A. No.

Q. All right, when did you do that?

A. It was just shortly after I bought it.

Q. Just shortly after you bought it?

A. Yes.

Q. And you saw these cows over there and you didn't know what the score was so you didn't go over there?

A. That's right."

Mr. Perryman denied that he had ever told anyone that the land survey made from his deed description showed more land than he thought he had purchased and as to the improvements, on cross-examination, he said:

"Q. Now what other improvements are there on the Clay Bowen property South of the fence as shown on the plat?

A. There's a barn and some small pens, hog pen, and there's a well.

Q. All right, is there a stock pond?

A. Yes.

Q. Has the Clay Bowen property been cleaned up and is it down in permanent pasture?

A. I don't think it's in permanent pasture, no.

Q. Has it been cleaned up?

A. It's been cleaned up.

Q. And livestock has been running in there?

A. I don't think there's any there now.

Q. None at all?

A. Not that I know of now.

*  *  *

Q. Now does he have some other buildings just North, or outside of that three-quarter acre?

A. Yes, he has a barn.

Q. On property claimed by you?

A. Yes, the barn.

Q. And where is it located with reference to this North line of the three-quarter acres?

A. It would be North of this three-quarters of an acre. It would be North of the three-quarters of an acre.

Q. Now what size building is that, Mr. Perryman?

A. I didn't look at it that close. I didn't, until it was straightened out, I just figured I would stay completely away from all of that.

Q. When was it built?

A. It's a new barn, it's not very old."

Mr. Bowen testified that his home is located on the three-fourths acre tract and that in 1969 he purchased the additional land here involved from Eagle. He said that following the purchase from Eagle, he went into immediate possession. He said that an old three strand barbed wire fence was along the northeast line of the property he bought and was on the south side of the road across the property, and that he erected a new six strand barbed wire fence in its place. He said he built the fence about two months after he purchased the property. He said he then built a barn on the property, cleaned up the land and sowed grass on it, and built a stock pond. He said he has livestock running on the property. He said he had only had one conversation with Mr. Perryman concerning the property and that was in 1972. He said that Mr. Perryman told him on that occasion that he thought he had bought only five acres but that according to his survey, he had purchased ten acres and that all he wanted was what belonged to him.

Mrs. Bowen testified in part as follows:

"Q. Now on the last acquisition from Mr. and Mrs. Eagle, have improvements been made on that property?

A. Yes, sir.

Q. What type of improvements?

A. We have cleaned off three of the fields, sowed it in grass, built a barn, had a pond built, and put the fence up.

Q. And where did you put the fence up?

A. Around along down the road that divided Eagle's

property from the part we bought from them.

Q. And what kind of fence was that?

A. Six strand barb wire fence.

Q. Do you know who put that fence up?

A. Yes, sir.

Q. Who did?

A. Me and my husband Clay..

Q. And what year was the fence erected?

A. Just after we bought the property.

Q. In '69?

A. Yes.

Q. Now at the place where you located the fence that you helped to put up, was there a then fence in place?

A. Yes, sir.

Q. And what kind of fence was it?

A. There was three strands of old barb wire."

Mrs. Bowen testified that the gravel road across the property leads to the Younger McGarrah's land lying north of their property. She testified that she talked with Mr. Perryman when he was having the survey made and she stated as follows:

". . . I went out there to see what they were doing, and the surveyor, he introduced hisself, and I was talking to Mr. Perryman—I didn't even know him at the time—and he told me who he was and he said that when he moved out there he thought it was five acres, but that it turned out to be ten, and he wanted what was his."

Audie Eagle testified that he purchased the property in 1966 and understood there was nine and one-fourth acres in the tract. He said that Bob Perryman bought the property in 1971. He said he rented the property to Perryman before Perryman purchased it. He said he rented it to Perryman on October 2, 1971, and that Perryman lived there under the rental arrangement until he purchased it in November. He was then asked if he had sold any of the property before the Perryman transaction, and he said:

"A. Me and Clay Bowen made a deal there, and there's a fence down across there, it was on the South side of the road there and the road went down across the land there and I could not fence across the road, and there was a bankment down there that I couldn't get up through there, so we made an agreement ourselves, and that's the way it stood.

* * *

Q. Mr. Eagle, at the time you and Mr. Bowen made the agreement which you testified to, where do the lands that you and he agreed on lay in relation to the road that crossed the property?

A. Laid on the South side.

Q. Now where did the road run to and from that crossed this property?

A. Right to the center.

Q. Sir?

A. Right in the center of the road, I mean field.

Q. Do you know whether or not there had been a fence there or was a fence being maintained along that road at that time?

A. Yes, sir.

Q. What kind of fence was that?

A. A three barb wire fence went right by the house on the South side of the road.

Q. Now is that fence still there?

A. Yes, sir, there's a new fence running there.

Q. There's a new fence there?

A. Yes, sir.

Q. What kind of fence is that?

A. It's barb wire.

Q. Do you know who put that up?

A. Yes, sir.

Q. Who did?

A. Mr. Clay Bowen.

Q. How long was it after you and he put up the agreement that he put up the fence?

* * *

A. I'd say around, between a month and a half or two months, and I had to leave home out there at that time.

Q. Were you there when the fence was installed?

A. No, sir.

Q. How close to the location of the old fence was the new fence installed?

A. It's right on the same property."

Eagle was then asked about the sale price of the property to Perryman and he said:

"A. Well there never was no agreement on that. They just paid me $1,975.00.

Q. Who paid you that?

A. Well I got it from the bank down there. Bob Spencer and—I think is the one that paid me."

On cross-examination Eagle testified that he had made a deed to Spencer and then testified as follows:

"Q. Then how did you sell to Mr. Perryman?

A. Well I rented the place, then I told him I didn't have any use for it and if he wanted to buy it, and him and Bob Spencer made some kind of a deal about the place. Now I don't know what kind of price he give for the place or nothing."

Mrs. Etta Crane testified that she operates a grocery store and salvage yard near the property involved and is acquainted with Perryman as well as Bowen. She said she recalled when Mr. Perryman and Mr. Bowen were having some difficulty over their boundary lines. She said she knew that surveys were being made and that sometime following the completion of the surveys, Mr. Perryman was in her store and in answer to the question of what he said she testified as follows:

"A. Well the best I can remember he said he had bought five acres but he had had the surveyors in there and it was a little more than what he thought he had bought."

She said she was not related to either of the parties and had no interest in the matter one way or the other.

On recall Mr. Perryman denied ever making remarks to the effect that his survey showed more land than he thought he had purchased.

From our view of the evidence in this case, on trial de novo, we are of the opinion that the chancellor's decree is against the preponderance of the evidence. Mr. Bowen's

testimony as well as that of his wife and Mr. Eagle clearly indicates that Eagle sold a portion of his property southwest of the gravel road to Bowen in October, 1969; that Bowen paid a substantial amount on the purchase price and went into immediate possession. Their testimony is uncontroverted that within two months after Bowen purchased the property, he erected a six strand barbed wire fence along the south side of the gravel road as the north or northeast boundary line of his property, in the place of a three strand barbed wire fence that was already there; that he erected a barn and dug a stock pond on the property and that he cleaned it up and planted it in pasture grasses.

According to Mr. Perryman's own testimony, he rented from Eagle and lived on the property northwest of the gravel road with the fence along the south side of it from October 2 until he purchased from Spencer on November 20, 1971. According to his own testimony, there were a barn, a few sheds, a well and stock pond on the property. He said he did not walk over all the property because he did not know where it was. He said he went all the way down the road along the fence but did not walk south of the fence and road because "there was livestock and I didn't know for sure what the deal was on it." He said he did not want to go on anyone else's property until he found out where the lines were.

We are of the opinion that Mr. Perryman's own testimony reveals sufficient evidence to put Mr. Perryman on such notice of Bowen's claim to a part of the property to have caused a reasonable person to make inquiry, and that had he made such inquiry of either Mr. Eagle or Mr. Bowen, he would have learned that Eagle had sold a portion of the property to Bowen approximately one year previously. We have not overlooked Perryman's testimony under examination by the chancellor to the effect that it was shortly *after* he purchased the property rather than *before* when he walked over the land north of the fence and observed the cows on the south side of the fence. It seems incredible to us that Perryman did not at least observe the six strand barbed wire fence, and the buildings and improvements on the south side of it, during the month he rented and lived on the property north of the fence and during the time he was considering purchasing the property and his curiosity was only aroused shortly after he had closed the deal.

Perryman denied making statements that he had purchased more property by the description and survey than he thought he had purchased as testified to by Mr. and Mrs. Bowen and Mrs. Crane, an uninterested witness. Perryman also denied that he mortgaged the property to Spencer but the record contains a mortgage dated November 29, 1971, and filed for record on November 30, 1971, wherein Perryman and his wife executed a mortgage to Spencer and his wife to secure the payment of a promissory note of even date in the principal sum of $8,000, and bearing eight and one-half per cent interest and payable in monthly payments of $80 each, beginning on December 15, 1971.

The extent or validity of Bowen's title under his contract with Eagle is not before us, but we conclude that Mr. Perryman was not a purchaser *without notice* of Bowen's claim, and that the decree must be reversed and this cause remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.